AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

UNITED STATES OF AMERICA

vs.

NATHAN MAYELL

**CRIMINAL COMPLAINT**

CASE NUMBER: 6: 13-mj- /267

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. Beginning on an unknown date, but no later than on or about March 19, 2013, and continuing through May 3, 2013, in Orange County, in the Middle District of Florida, and elsewhere, the defendant did, attempt to possess with intent to distribute one (1) kilogram of methylone in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846. I further state that I am a Special Agent with the Drug Enforcement Administration, and that this Complaint is based on the following facts:

### SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof: ☒ Yes   ☐ No

Signature of Complainant
Steven L. Schappert

Sworn to before me and subscribed in my presence,

May 4, 2013                              at              Orlando, Florida

The Honorable Gregory J. Kelly
United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF FLORIDA
ORANGE COUNTY

CASE No. 6:13-mj- /267

## AFFIDAVIT

The undersigned Steven L. Schappert, being duly sworn, hereby states as follows:

1.      I am a Special Agent (SA) with the United States Drug Enforcement

Administration (DEA) and have been so employed as such since June 10, 2010. I am an

investigative, or law enforcement officer of the United States within the meaning of Title 18,

United States Code, Section 2510(7), that is, an Officer of the United States who is empowered

to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United

States Code, Section 2516.

2.      I have received nineteen weeks of training in drug investigations and related legal

matters at the DEA Training Academy in Quantico, Virginia. Prior to my employment with

DEA, I was a Captain in the United States Air Force for approximately four years.

3.      I have received courses of instruction from DEA related to investigative

techniques and conducting drug and financial investigations. I have participated in and

conducted investigations which have resulted in the arrests of individuals who have smuggled,

received and distributed controlled substances, including marijuana, heroin, cocaine, and other

synthetic drugs, as well as the seizure of illegal drugs and proceeds of the sale of those illegal

drugs.

4.      In addition, I have conducted, in connection with these and other cases, follow-up

investigations concerning the concealment of drug-produced assets, money, bank records, etc.,

and the identification of drug conspirators through the use of ledgers, telephone bills and records,

photographs and bank checks, as related to drug trafficking. I have participated in investigations

1

involving the interception of wire communications and am familiar with the ways in which drug traffickers conduct their business, including, but not limited to, their methods of importing and distributing drugs, their use of cellular telephones, and their use of numerical codes and code words to conduct their illegal transactions.

## BASIS FOR PROBABLE CAUSE FOR THE ARREST OF
## NATHAN MAYELL

5.     This affidavit is based upon knowledge that I have acquired during an investigation of drug trafficking activities committed by Nathan MAYELL in the Middle District of Florida and elsewhere.  This affidavit is based upon my personal knowledge, training and experience as a law enforcement officer, information that I received from other law enforcement officers and agents, information I received from official reports of Special Agents of the DEA, and information I received from other investigative means, including surveillance, controlled phone calls, and confidential sources.  Since this affidavit is being submitted for the limited purpose of issuing a criminal complaint against Nathan MAYELL, I have not included each and every fact known concerning this investigation.

6.     Starting on or about March 19, 2013, the DEA Orlando District Office began an investigation into the methylone trafficking activities of Sebastien SALZMANN.  A DEA confidential source in Palm Beach, FL, hereinafter referred to as CS-1,  identified SALZMANN as a trafficker of 3,4- Methylenedioxymethylcathinone, a Schedule I narcotic commonly known and referred to as methylone, or by its street name "Molly."  CS-1 identified SALZMANN as an individual who received kilogram quantities of methylone in the mail from an unknown source in China and distributes it in the Middle District of Florida.

7.     On March 19, 2013, CS-1 informed DEA Agents that a package containing methylone was being sent from China to an individual at 1457 Portofino Point, Apt. 305 Oviedo,

2

FL. The individual receiving the package in Oviedo later became a DEA Confidential Source and is hereinafter referred to as CS-2. On this same date, I contacted US Postal Inspector Jim Giel in an attempt to intercept the package. Inspector Giel informed me that the package was unable to be located at the Oviedo, FL Post Office.

8.      CS-2 has no criminal history and is cooperating with DEA Orlando District Office Special Agents in the hopes of not being charged with committing a drug-related offense. The information provided by the CS was independently corroborated by DEA Special Agents through different means of intelligence gathering throughout the investigation to include surveillance, recorded phone calls, and confidential source debriefings.

9.      On March 20, 2013, DEA Special Agent Joshua Baker and I spoke with the front office management of Tivoli apartments located at 1457 Portofino Point, Apt. 305 Oviedo, FL to inquire about packages being sent to CS-2's apartment. A log kept by the apartment office indicated that a package was delivered on March 19, 2013 and picked up by CS-2 on that same date from the front office.

10.     On March 20, 2013, SA Baker placed a call to CS-2 via a cell phone number provided by the Tivoli apartments. SA Baker identified himself as a DEA Special Agent and asked CS-2 if he was willing to meet and speak with DEA agents about a parcel delivered to his apartment. CS-2 subsequently agreed to meet me and SA Baker at his/her apartment. On this same date, CS-2 arrived at his/her apartment and SA Baker and I approached CS-2 and identified ourselves as DEA Special Agents and displayed our credentials. I then questioned CS-2 about a parcel that was sent to his/her apartment the previous day. CS-2 began to become extremely nervous and requested a minute to catch his/her breathe. CS-2 then explained that he/she had received a parcel from China containing methylone, and that he/she had the package inside

3

his/her apartment. CS-2 then freely consented to allow me and SA Baker to retrieve the methylone that was being stored in the top drawer of his/her dresser located inside CS-2's bedroom.

11. During an interview conducted on March 20, 2013, CS-2 explained that a subject by the name of Nathan MAYELL had paid CS-2 $6500 for approximately a half kilogram of methylone. CS-2 then gave $4750 to Sebastien SALZMANN who then placed the order to China for the methylone. The remainder of the money was kept by CS-2. CS-2 then explained that MAYELL would drive to Orlando, FL to pick up the half kilogram and distribute the methylone in South Florida. On this same date, CS-2 contacted SA Baker informing him that CS-2 called MAYELL explaining that the half kilogram of methylone was stolen and that he would order another one for MAYELL at a later date. According to CS-2, MAYELL agreed to have CS-2 place another order of methylone from China to provide MAYELL at a later date.

12. Between April 23, 2013 and May 2, 2013, CS-2 negotiated with MAYELL via text messages, about the price of ordering another half kilogram of methylone. In these saved text messages, MAYELL questions CS-2 of the price for an immediate supply of a second half kilogram of methylone. MAYELL agreed to pay $2000 at a later date if CS-2 fronts the second half kilogram of methylone, totaling one full kilogram.

13. On May 2, 2013, CS-2 placed a recorded call to MAYELL informing him that CS-2 could procure approximately one kilogram of methylone for MAYELL. CS-2 also explained that MAYELL could pay CS-2 at a later date for what MAYELL would owe for the second half kilogram (MAYELL previously prepaid CS-2 for the first half kilogram referenced in paragraph 11). MAYELL agreed that he would pay the remainder of what he owed by June of 2013 and would travel to Orlando, FL to meet CS-2's supplier and pick up the one kilogram of

4

methylone.

14.     On May 3, 2013, a recorded call was placed between MAYELL and CS-2
negotiating plans for MAYELL to meet with CS-2's supplier later that day to pick up the
methylone. On the recorded call, CS-2 states to MAYELL "I just spoke with my guy and he has
the kilogram of methylone for you." CS-2 also states "you're cool with getting the key of
methylone right," "its really good methylone." MAYELL responds by saying "I trust you man,"
and, "I will head out," indicating that he will depart South Florida for Orlando, FL. CS-2 also
asks MAYELL how much money he can bring with him, MAYELL responds by saying, "I
don't have much, maybe like $300." CS-2 then replies by saying, "yea, then you pay $300 now
and $1700 later." The call ends with MAYELL saying he will see you later, referring to CS-2.

15.     On May 3, 2013, at approximately 8:15PM, acting in an undercover capacity, I
received a call from MAYELL shortly after I instructed CS-2 to provide my number to
MAYELL. MAYELL told me that he was passing downtown Orlando. I then instructed
MAYELL to continue to Lake Mary Blvd and that he could meet me behind the Chili's.
MAYELL then confirmed and stated that he would be there in approximately 20 minutes. I then
asked MAYELL what type of vehicle he was driving. MAYELL responded by saying "a blue
four door Hyundai." I then gave the description of my vehicle to MAYELL. At approximately
8:30PM, I received a second call from MAYELL, stating that he was at Chili's and continued to
ask directions to find my vehicle. MAYELL stated he was driving around looking for my
vehicle. At this time, two marked Seminole County Citizens Observer Patrol vehicles entered
the parking lot in tandem, passing by my vehicle. The Seminole County Citizens Patrol vehicles
were unrelated to this investigation. Simultaneously, MAYELL, who was still on the phone line
with me, hung up his phone. I then attempted multiple times to contact MAYELL, but had no

5

success.

16.     Shortly after I lost contact with MAYELL, DEA Orlando agents discovered a
vehicle matching the description of the vehicle MAYELL described to me. DEA Agents then
identified a subject matching the description of MAYELL inside Keller's BBQ restaurant,
adjacent to where MAYELL's suspected vehicle was parked. DEA SA Brian Conlin saw
MAYELL sitting in Keller's BBQ restaurant for approximately one and a half hours, until the
restaurant closed. At approximately 10:00PM, SA Conlin saw MAYELL walking alone away
from the restaurant, and proceed away from his suspected vehicle and out to Lake Mary Blvd.
MAYELL was then observed at the Circle K gas station across the street from Chili's on Lake
Mary Blvd. At this time, DEA Orlando Agents approached MAYELL, fully marked as Law
Enforcement Officers. DEA SA Daniel Tilton was approximately five feet from MAYELL and
stated "Nathan." MAYELL looked at SA Tilton and subsequently turned around and walked
away. SA Tilton again approached MAYELL and asked him "are you Nathan?" MAYELL
stated "I don't know." SA Tilton identified MAYELL based upon MAYELL's driver's license
photograph. MAYELL was detained and subsequently transported to the Orlando District
Office.

17.     Simultaneously, DEA Orlando agents identified an unknown female subject
departing Keller's BBQ restaurant approximately five minutes after MAYELL departed. SA
Conlin saw the unknown female inside the restaurant eating with MAYELL. The unknown
female walked in a similar direction as MAYELL, away from the blue Hyundai parked near the
Keller's BBQ restaurant. The female subject was then approached by DEA agents fully marked
as Law Enforcement Officers. The female subject immediately asked to speak with her attorney
prior to agents making any statements. At this time, the female subject, later identified as Emily

6

WENCELBLAT, was detained and transported to the Orlando District Office.

18.     At approximately 10:30PM, I witnessed SA Baker read MAYELL his <u>Miranda</u> rights. MAYELL then stated that he would like to speak with his attorney. MAYELL then noted that his attorney's number was written on his hand, and would like to speak with him. Subsequently, I attempted to process MAYELL, in which he refused to provide any information. A Florida driver's license found inside MAYELL's wallet confirmed his identity as MAYELL. I noted that MAYELL's voice matched the voice of the subject I spoke with during the undercover phone calls earlier that day, as well as the recorded calls with CS-2. MAYELL was then transported to Seminole County Jail.

19.     Based upon the information detailed above, probable cause exits to believe that Nathan MAYELL violated Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846.

20.     This concludes my affidavit.


Steven L. Schappert
Special Agent
Drug Enforcement Administration


Subscribed and sworn before me
This 4th day of May, 2013.


The Honorable Gregory J. Kelly
United States Magistrate Judge

7